IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PAIGE CARTER, Special Administrator of the ESTATE OF KEVIN C. CARTER, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>SCOTT FRAKES, Former Director of the Nebraska Department of Correctional Services, in his individual capacity;<br>MICHELE WILHELM, Warden of Nebraska State Penitentiary, in her individual capacity;<br>DR. HARBANS DEOL, Former Medical Director for Nebraska Health Services, in his individual capacity;<br>SHELBY BARRAGAN-LOPEZ, in her individual capacity;<br>MICHAEL MCCANN, in his individual capacity;<br>CHARICE TALLEY, in her individual capacity;<br>JEFFERY REED, in his individual capacity;<br>DOUGLAS HEMINGER, in his individual capacity;<br>MATT HECKMAN, in his individual capacity;<br>FRANKLIN HOWARD, in his individual capacity;<br>KIM MCGILL, in her individual capacity; and<br>JOHN/JANE DOES 1-6, all employees of Nebraska State Penitentiary, in their individual capacities,<br><br>Defendants. | Case No. 8:23-cv-485<br><br><br><br><br><br><br><br><br>**FIRST AMENDED COMPLAINT, JURY DEMAND AND REQUEST FOR PLACE OF TRIAL** |

COMES NOW Paige Carter, Special Administrator of the Estate of Kevin C. Carter, Deceased, by and through her counsel of record, and for her causes of action against Defendants, states as follows:

1

## JURISDICTION, VENUE and PARTIES

1. This Court has jurisdiction pursuant to the provisions of 28 U.S.C. §§1331 and 1333 and 42 U.S.C. §1983.

2. Venue for this action is proper in the United States District Court for the District of Nebraska, because the acts and omissions complained of herein occurred in Lincoln, Lancaster County, Nebraska.

3. Plaintiff Paige Carter is the duly-appointed Special Administrator of the <u>Estate of Kevin C. Carter</u>, PR 23-862, Probate Court of Lancaster County, Nebraska, and is a resident of Pottawattamie County, Iowa.

4. Defendant Scott Frakes ("Frakes") was at all times relevant the Director of the Nebraska Department of Correctional Services ("NDCS"), and is now the former Director of the NDCS. He is sued in his individual capacity.

5. Defendant Michele Wilhelm ("Wilhelm") was, at all times relevant, the Warden of the Nebraska State Penitentiary ("NSP"). She is sued in her individual capacity.

6. Together, Wilhelm and Frakes were the policymakers and final decision-makers for NSP at all relevant times, and were responsible for articulating, training, and ensuring compliance with official and unofficial policies for the protection of inmates and any other person inside the secured area of the facility.

7. Defendant Dr. Harbans Deol ("Dr. Deol") was at all relevant times employed by the Nebraska Department of Corrections Services as its Medical Director.

8. Defendant Michael McCann ("McCann") was at all times relevant the Unit Manager of Housing Unit 2, the unit which housed Angelo Bol and Kevin Carter on November 6, 2020.

9. Defendant Shelby Barragan-Lopez ("Lopez") was at all times relevant the Case Manager of Housing Unit 2, the unit which housed Angelo Bol and Kevin Carter on November 6, 2020.

10. Defendant Charice Talley ("Talley") was at all relevant times a case manager for Unit 2, the unit which housed Angelo Bol and Kevin Carter on November 6, 2020.

11. Defendant Jeffery Reed ("Reed") was at all relevant times a case manager for Unit 2, the unit which housed Angelo Bol and Kevin Carter on November 6, 2020.

12. Defendant Douglas Heminger ("Heminger") was at all relevant times a Deputy Warden for the Nebraska State Penitentiary.

13. Defendant Matt Heckman ("Heckman") was at all relevant times a Deputy Warden for the Nebraska State Penitentiary.

14. Defendant Franklin Howard ("Howard") was at all relevant times a Unit Administrator for the Nebraska State Penitentiary.

15. Defendant Kim McGill ("McGill") was at all relevant times a Unit Administrator for the Nebraska State Penitentiary.

16. DOES 1-6 are and/or were at all relevant times employed by the Nebraska Department of Correctional Services as employees or contractors at NSP.

17. Each of these Defendants is sued in their individual capacities.

18. All actions and inactions alleged herein were done under color of state law.

## BACKGROUND FACTS

19. On July 7, 2015, Angelo Bol ("Bol") entered the custody of NDCS.

20. Bol was in NDCS' custody after being arrested in Buffalo County, Nebraska on suspicion of First Degree Murder and Use of a Firearm to Commit a Felony.

21. Specifically, Bol waited in a parking lot for his former co-worker who he then shot a total of seven times, two of which were to the head while the co-worker laid on the ground.

22. He was charged under case State v. Bol, CR 15-2, in the District Court of Buffalo County, and he plead guilty to First Degree Murder on May 8, 2015.

23. On August 5, 2016, the Nebraska Supreme Court issued a Mandate upholding Bol's conviction on appeal in case S-15-706.

24. As of November 2020, Bol was at NSP serving a life sentence.

25. On December 18, 2019, Kevin C. Carter ("Carter") entered the custody of NDCS after being convicted of two charges, Terroristic Threats and Assault with a Deadly Weapon.

26. At the time, Carter was nineteen (19) years old, and he was sentenced to a combined total of six to nine years.

27. Based on his sentence and credit for time served, Carter's parole eligibility date was April 10, 2022.

3

**BOL'S MENTAL HEALTH HISTORY AFTER INCARCERATION**

28. Ever since he came to be in the custody of NDCS, Bol's history of mental illness was well-known and well documented.

29. While incarcerated in NDCS, Bol received diagnoses of delusional disorder, unspecified psychotic disorder, schizophrenia, and PTSD.

30. Bol exhibited paranoid ideation and delusional beliefs that contributed to significant interpersonal difficulties and aggression between Bol, staff and other inmates.

31. Specifically, Bol reported other inmates and correctional staff were conspiring to kill him. He referenced these individuals targeting him prior to coming to prison, then also followed him to prison and between prison facilities. He asserted that inmates and staff called him "gay", poisoned his food, placed hairs and screws in his food, drugged him, sexually assaulted him, and intended to kill him. He also stated that correctional staff have "messed with" his phone calls and water temperature during showers.

32. Bol refused meals, urinated through his cell hatch, flooded his cell, and engaged in verbal and physical aggression towards peers and staff. He reported he had to "violently respond" to those inmates to protect himself and he needed to be separated from certain inmates and staff.

33. As a result, in August of 2017, he was placed on an involuntary medication order ("IMO"). The IMO found that Bol was suffering from a serious mental illness, that unmedicated, Bol posed a substantial risk that he will inflict physical harm on others as evidenced by his previous behavior, and that medication would help prevent Bol's assaultive behavior.

34. Upon the initial IMO being granted, Bol was prescribed an injectable antipsychotic medication.

35. His behavior and mental state improved vastly; notably, Bol received three misconduct reports during the period he was administered antipsychotic medication, while prior to the initial IMO, he received 46 misconduct reports.

36. Notwithstanding the treatment, Bol continued to confess a belief in a conspiracy against him through his perceived mistreatment by other inmates and staff members. Further, Bol demonstrated poor compliance with his mental health sessions and limited insight into his mental illness.

37. He was also not independently compliant, frequently requesting the medication be stopped due to reported side effects.

38. Despite the tangible benefits of medication, in October 2018, his antipsychotic medication was reduced, then ultimately changed to an oral antipsychotic medication.

39. In May 2019, his antipsychotic medication was discontinued entirely, despite the earlier findings of benefits to him and the tangible proof of his vastly improved behavior that medication was in his best interest.

40. As expected, Bol's behavior underwent a steep decline after being taken off medication.

41. By early 2020, Bol presented with increased delusional ideas and paranoia that peers and staff were conspiring against him, that his food was being drugged, and that staff and inmates were sexually assaulting him.

42. Coupled with the noticeable decline in his behavior, Bol also reported in writing to staff that he had been lying to staff, despite his self-reporting that he was doing well.

43. As 2020 progressed, Bol's behavior became more pronounced and menacing.

44. He stated staff and inmates had threatened him, and he reported having homicidal ideation toward those individuals. These threatening words from Bol soon translated to violent actions by him.

45. On June 3, 2020, Bol threatened to murder a staff member after being told to put on a mask (related to Covid-19 precautions).

46. On July 7, 2020, Bol attacked his cellmate without warning and without provocation. The cellmate involved reported that Bol "just attacked me."

47. In July 2020, Bol expressed interest in resuming medication but did not attend the scheduled appointments in May, June or July of that year, and the psychiatric provider noted than an IMO may need to be reinitiated due to the exacerbation of his symptoms.

48. Bol's increasingly erratic behavior escalated and through 2020, Bol wrote to various external parties, such as various Nebraska State Senators, the Ombudsman, and the ACLU, reiterating his long-standing and well-known delusions that the prison staff were conspiring against him.

49. Notably, he asserted the prison staff were influencing the behavior of other inmates to harm him. He repeatedly referenced prison administrators as tampering with his mail, being drugged and sexually assaulted, and prison staff and the Ombudsman refusing to investigate his concerns. Despite all of these concerns regarding Bol's mental health, an IMO was not put in place

and he did not receive follow up psychiatric treatment before being placed in a cell with Kevin Carter.

## JOINT PLACEMENT OF BOL AND CARTER

50. Due to previous assaults with inmates in general population, Bol was already in restrictive housing on or about October 31, 2020 when Carter and Bol were placed in the same cell in Housing Unit 2 at NSP.

51. On information and belief, prior to such time, Bol and Carter were evaluated by McCann, Lopez, Talley, Reed, Heminger, Heckman, Howard, McGill and/or Defendant Does 1 through 6 to ascertain the risk of harm each posed to others, as well as the risk that each would be the victim of harm at the hands of other inmates.

52. Further, Bol's medical history, and the potential danger of Bol's behavior, was well known throughout Unit 2 and the facility.

53. McCann, Talley, Reed, Lopez, Heminger, Heckman, Howard, McGill and Does 1 through 6 failed to exercise reasonable care in performing the diagnostic evaluation of both Carter and Bol, including failing to properly determine the threat of perpetrating violence and/or being the victim of violence.

54. The decision to place Carter and Bol in the same cell was made by McCann, Talley, Reed, Heminger, Heckman, Howard, Lopez, McGill and/or Defendant Does 1 through 6, in their capacities as employees at NSP. Making decisions to double-bunk inmates was within the scope of the job duties and responsibilities of McCann, Talley, Reed, Heminger, Heckman, Lopez, Howard, McGill and Does 1 through 6 at NSP.

55. In deciding to place Carter and Bol in the same cell, McCann, Talley, Reed, Heminger, Heckman, Howard, Lopez, McGill and Does 1 through 6 failed to follow mandatory regulations, failed to consider the individual material and relevant factors about Carter and Bol, failed to consider the information available to them contained with the inmate files for Carter and Bol, failed to consider the threat to other inmates and risk of victimization for Carter and Bol, and took action and failed to act in other ways to be determined after discovery in this matter.

56. The actions and inactions on the part of McCann, Talley, Reed, Heminger, Heckman, Lopez, Howard, McGill and Does 1 through 6 placed Carter at an unreasonable risk of harm at the hands of Bol.

57. The actions and inactions on the parts of McCann, Talley, Reed, Heminger, Heckman, Howard, Lopez, McGill and Does 1 through 6 were conducted under the supervision of Defendants Warden Wilhelm and Director Frakes and their knowledge of the dangers presented by Bol's mental health and lack of medication.

58. In their capacities as supervisors, policymakers and final decision-makers for NSP, Defendants Warden Wilhelm and Director Frakes failed to properly supervise and train Does 1 through 6 and others, both as to the danger of double bunking and to the potential physical danger of Bol.

59. Defendants Warden Wilhelm and Director Frakes were aware of instances in which inmates were double bunked with incompatible cell mates creating an unreasonable risk of harm, including but not limited to the death of Terry Berry.

## MEDICAL TREATMENT FAILURE

60. At various times in 2017 and 2019, NDCS staff determined that Bol was suffering from serious mental illnesses, and that as a result, when not medicated, there was a substantial risk that Bol would inflict physical harm upon another as evidenced by his history of threatening, physically aggressive and assaultive behavior; that psychotropic medication was in Bol's best interest, would treat his medical disorder, would prevent his decompensation and help prevent him from causing harm to others and to himself, and that Bol did not have sufficient insight to ensure he would be consistently compliant in voluntarily taking his medication regimen.

61. Defendant Frakes and Defendant Deol and his medical staff were aware of the dangers of an unmedicated Bol.

62. NDCS, with the assistance of Deol and his staff, had Bol involuntarily medicated several times. The medication period was limited to a six-month period. Defendant Frakes was aware of this, because he particularly participated in the involuntary medication of Bol, but there were long periods of time that Bol was unmedicated.

63. In July 2020, while Bol was unmedicated, he requested antipsychotic medications, but he failed to attend his psychiatry appointments.

64. NDCS staff recognized Bol had a history of Schizophrenia and Delusional Disorder, paranoid/persecutory, and previous history of an IMO. Further, NDCS Psychiatry staff acknowledged that Bol was at that time in the restrictive housing unit for recently attacking his cellmate on the housing unit in general population.

65. On July 15, 2020, Psychiatry believed that Bol needed to be placed back on an IMO for stabilization, due to the exacerbation of his symptoms, and they recommended a plan to evaluate him for an IMO.

66. Nevertheless, there was no follow up done by any Defendant to determine whether Bol, with a laundry list of diagnoses and who had requested medication, received the psychiatric treatment needed.

67. Sometime after being placed in the cell with Carter, Bol stated to McCann, Talley, Reed, Heminger, Heckman, Howard, Lopez, McGill and/or Does 1 through 6 that he did not want Carter as a cellmate as he believed Carter to be connected to a Sudanese tribe that had hired Carter to kill Bol.

68. Further, Bol indicated that he would kill Carter if they were not separated.

69. Despite this warning, Carter remained in the same cell as Bol, and was killed by Bol within a matter of days.

70. , Defendants Warden Wilhelm and Director Frakes were aware that NDCS and NSP employees were not following safety guidelines provided by NDCS, including NAC 210.01 and other regulations to be established through discovery.

71. This failure to comply with safety regulations in the double bunking of inmates created a substantial risk of harm to double bunked inmates.

72. Further, Defendants Warden Wilhelm and Director Frakes were indifferent to said risk by failing to ensure additional or specific training regarding the decision to double bunk inmates.

73. Additionally, Defendants Warden Wilhelm and Director Frakes were indifferent to said risk by failing to provide and ensure additional supervision over the NSP and NDCS employees making these decisions, as well as providing proper supervision over the individual decisions pertaining to double bunking inmates.

74. Because they were aware of the substantial risk of harm, these conditions constitute deliberate or callous indifference to inmates' safety from assault at the hands of other inmates with whom they share a cell.

75. On November 6, 2020, NSP staff found Carter lying on the floor of his shared cell, unresponsive, with a sheet covering him.

76. He was pronounced dead that evening.

77. On or about May 27, 2021, a grand jury returned an indictment against Bol for Murder in the First Degree, alleging that on November 6, 2020, Bol "did kill Kevin C. Carter purposely and with deliberate and premeditated malice".

78. From the earliest time the Medical Department saw Bol in 2015, and more importantly in 2017, Defendant Deol and his staff were aware of the dangers posed by Bol, especially when he was unmedicated. Bol was unmedicated for long periods of time, and he thus posed a danger to staff and other inmates, especially his cellmates. The Medical Department failed to impress upon others in the facility who were responsible for Bol and his cellmates, the dangers real and potential as seen by the Medical Department.

79. The most dangerous failure of the Medical Department and its leadership was in not requiring Bol to be medicated in July of 2020. This failure was a proximate cause of the death of Kevin C. Carter.

## FIRST THEORY OF RECOVERY
## EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

80. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

81. When Carter was incarcerated under Defendants' supervision and custody, they were obligated to take reasonable measures to guarantee his safety and to protect him from violence at the hands of other inmates.

82. Defendants subjected Carter to a substantial risk of serious harm, *to wit*:

   a. Defendants' failure to properly examine, diagnose and assess Carter's and/or Bol's risk of assault and/or risk of being assaulted;

   b. Defendants' failure to consider, and/or willful ignorance of, Bol's substantial history of violent assault when assessing his compatibility with Carter;

   c. Defendants' failure to consider, and/or willful ignorance of, Bol's mental health issues and/or mental incompetency when assessing his compatibility with Carter;

   d. Defendants' failure to consider, and/or willful ignorance of, Carter's proximity to being released, and Bol's life sentence, when determining to bunk Carter with Bol;

   e. Defendants' decision to bunk Bol and Carter;

   f. Defendants' failure to staff NSP with enough personnel, including unit caseworkers, to provide observation of inmates to detect abnormalities, problems, or unrest, and

the counseling of inmates in assisting them to adapt to the prison environment, including inmates Bol and Carter;

g. Defendants Frakes's and Wilhelm's failure to adequately train, monitor and supervise NSP staff to ensure that proper administrative requirements and protocol were followed in housing decisions;

h. Other acts and/or omissions to be determined at trial or other dispositive hearing.

83. Defendants had actual knowledge of each of these risks, but disregarded or acted with deliberate indifference to Carter's safety.

84. By the failures enumerated above, Defendants failed to act in good faith and without malice toward Carter's constitutional rights.

85. Based on the foregoing acts and/or omissions, Carter suffered physical, mental and emotional injury, to include the loss of his life.

86. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the lives and safety of others, including Carter.

87. As a result of Defendants' actions as alleged herein, Plaintiff has been required to retain the services of attorneys and is entitled to a reasonable amount for attorney's fees pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

88. Plaintiff requests that this matter be tried to a jury in Omaha, Nebraska.

WHEREFORE, Plaintiff requests the Court find that the Defendants herein were deliberately indifferent to the safety of Kevin C. Carter based on the foregoing allegations of acts and/or omissions; enter judgment in favor of the Plaintiff in the following amounts:

A. Compensatory damages in an amount to be proven at trial, for Carter's physical, emotional and mental injuries and pain and suffering;

B. Punitive damages to punish and deter the reprehensible conduct alleged in this Complaint;

C. Reasonable attorney's fees;

D. The costs of this action;

E. Additional damages as are proven at trial; and

F. Such other relief as this Court deems equitable and proper.

DATED February 1, 2024

PAIGE CARTER, Special Administrator of the Estate of KEVIN C. CARTER, Deceased, Plaintiff

By: */s/ Thomas J. Monaghan*
Thomas J. Monaghan, #12874
Rodney C. Dahlquist, Jr., #23912
Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein PC LLO
1403 Farnam Street, Suite 232
Omaha, NE 68102
(402) 884-7044
(402) 884-7045 fax
Tom@dltlawyers.com
Rodney@dltlawyers.com
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2024, a true and correct copy of the foregoing was electronically filed and served via the CM/ECF System to the parties of record, and sent via US Mail, postage prepaid to the following: None.

*s/ Thomas J. Monaghan*